# IN THE COURT OF APPEALS OF IOWA

No. 24-1008
Filed September 17, 2025

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**SAMANTHA FAITH BEVANS,**
       Defendant-Appellant.
_____

Appeal from the Iowa District Court for Benton County, Chad Kepros, Judge.

A criminal defendant appeals her conviction for murder in the first degree. **AFFIRMED.**

Raya D. Dimitrova of Carr Law Firm, P.L.C., Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**BULLER, Judge.**

"I killed her. I killed her myself. We killed her, we killed her. We thought about it, planned it out fucking perfectly." Samantha Bevans recorded herself saying that on Snapchat, smiling and raising her middle finger to the camera, after she and her boyfriend Tacoa Talley[1] killed Samantha's[2] stepmother Jodie Bevans. A jury found Samantha guilty of first-degree murder. After considering Samantha's appellate arguments about venue, a mistrial motion, the sufficiency of the evidence, and a jury instruction, we affirm her conviction.

### I.      Background Facts and Proceedings

In the months leading up to the murder, there was discord between Samantha and the rest of her family. Samantha had problems with money, drugs, and the men she dated. The whole family—including Jodie—thought Talley was dangerous and a bad influence, and they banned him from the family home. Family members also caught Samantha stealing from them at the house. Mike Bevans—Samantha's father and Jodie's husband of eighteen years—started sleeping with a gun by the bedside. The conflict culminated with Mike and Jodie kicking Samantha out the month before Jodie was killed.

After this, Jodie and Samantha's relationship soured. Samantha's sister explained: "Jodie was always wanting to help Samantha and would help her whenever she needed anything. Samantha, when she needed something, she

---

[1] Talley was tried first, and last year a panel of this court affirmed Talley's conviction for first-degree murder. *See State v. Talley*, No. 23-0914, 2024 WL 4370576, at *5 (Oct. 2, 2024).

[2] Because of shared last names, we refer to the defendant and other adult members of the Bevans family by first name or description.

would be nice to her. Otherwise, if things didn't go her way, then she would turn on Jodie and blame her for everything." Samantha's daughter[3] described the dynamic similarly. Samantha told her sister she blamed Jodie for losing custody of her kids and other legal troubles. Mike similarly remembered Samantha being mad that Jodie wouldn't "go to court and lie for her," leading Samantha to threaten that Jodie "could be tooken [sic] out." And Samantha's daughter remembered it the same way.

Jodie, Mike, Samantha's daughter, and Samantha's sister's family all planned a camping trip, setting up the campsites the day of the murder. Jodie planned to rendezvous at the campsite after her nursing shift the next day. When Jodie didn't arrive at the campsite around dinnertime as expected, the family began to worry. They tried calling Jodie's phone, but she didn't answer. They called Jodie's work, but Jodie's employer said she hadn't showed up for her shift—which was very unlike her. Samantha's daughter tried to check a security camera in the house from her phone, but the application said the camera had been disconnected at 11:06 p.m. the night before. The family headed home to check on Jodie and called police on their way.

Local law enforcement met the family at the house, where they found the front door was locked. But the family never locked the front door handle because they had lost the key—they only used the deadbolt. The family and law enforcement entered the house through a window and discovered Jodie on her

---

[3] Samantha has multiple children who are not involved in this case. Any references to Samantha's daughter in this opinion refer to her oldest child, who lived with Mike and Jodie.

bed, obviously deceased. Samantha's sister, who worked in law enforcement and was a paramedic, stopped her father from coming into the bedroom so he wouldn't have to see Jodie's corpse.

Benton County deputies followed the family in and found Jodie cold to the touch with no pulse and obvious lividity. A key to the family safe was next to Jodie on the bed, and cash was missing. Agents with the Division of Criminal Investigation, who arrived within an hour, observed bruising on the left side of Jodie's face that appeared consistent with a blow to the head.

The state medical examiner later performed an autopsy that revealed abrasions to Jodie's face around the mouth, cheeks, and nose; a black eye; petechiae in both eyes; internal neck-muscle injuries; and hemorrhages in the scalp tissue and the side of the skull—all consistent with impacts to the head, typically from sustained pressure. The medical examiner specifically opined the injuries were consistent with a pillow over the face and Jodie struggling against her attacker. Jodie's cause of death was ruled asphyxiation. And while there were no "classic findings" that would suggest strangulation by hands or ligature, the probable mechanism of death was suffocation by a pillow over the face. The manner of death was homicide.

Police eventually interviewed Jayson Wells, a man who by his own description was "down and out" and living in his car at the time. Wells was with Samantha and Talley for much of the day of the murder. According to Wells, Talley (and to a lesser degree Samantha) alternately held his dog Bowzer or his car hostage through a multi-day crime-and-methamphetamine bender. Wells was afraid of both of them.

After corroborating Wells's statements with video surveillance footage from hotels and cell-phone data from Samantha, Talley, and Wells's phones, the DCI established this timeline:[4]

- Wells met up with Samantha at a rest stop on the morning of the day before the murder.

- The next morning, Wells took Samantha and Talley to the Linn County Courthouse. Then they drove to Shellsburg.

- Wells took Samantha to the family home, where she acquired some of her clothes and possessions. Wells remembered Samantha "was very anxious and very on edge about something."

- Wells and Samantha picked up Talley and went back to Cedar Rapids. That afternoon, the three went out to the campground to see if Jodie was there.

- The three then went to a motel and smoked methamphetamine.

- Samantha told Wells her stepmother had breast cancer and "was about to die." Samantha also said she was mad at Jodie because Jodie had stolen or kept "tip money" that belonged to Samantha.

- Wells testified that, at some point during the evening, Samantha and Talley left in his car without him. Consistent with that account, surveillance footage showed Samantha and Talley leaving without Wells.

- The Bevans family's interior surveillance camera was disabled at 11:06 p.m. Neither Samantha's nor Talley's phones showed any activity around this time, likely because they had been turned off.

- Samantha and Talley's demeanors were generally "calm" and "happy" when they returned to the hotel. They gave Wells $75 cash.

- The three checked into a new hotel the next day. At one point, Wells overheard Samantha yelling at Talley: "that was awesome, babe, you holding her down with a pillow while I got my two cents in." Samantha

---

[4] The DCI agent used numerous demonstrative exhibits during her testimony to explain the basis for her conclusions using forensic cell-phone data. Unfortunately, the State did not make the demonstratives part of the record on appeal, so we cannot review or consider them.

also said something about how "she grabbed a pillow and held it over her face," but Wells didn't know the context at the time.

- At 9:14 a.m. Saturday morning, Samantha saved a video of herself and Talley on Snapchat, in which she says: "I killed her. I killed her myself. We killed her, [shows middle finger,] we killed her. [laughing] We thought about it, planned it out fucking perfectly." Talley is also in the video, at one point mumbling "I knew this was happen[ing]" and "good job."

- Eventually, the three made their way to a Bettendorf casino and hotel, where Wells recalled Samantha became dysregulated and started talking about how he was betraying her if he left and how her stepmother was a CIA agent.

- Wells fled the hotel with Bowzer—leaving behind his car keys, wallet, and belongings—while Samantha and Talley were in a physical altercation. He made his way to a public library where he fell asleep and was awakened by police.

- Wells later discovered a list in Samantha's handwriting in his car, which had been abandoned. Among the various things written on the list were: "kill Jodie" and "Jodie—phone was off."

DCI agents first interviewed Samantha at the Bettendorf casino. She generally denied killing Jodie. Eventually agents interviewed Samantha a second time. She claimed that the Snapchat video—the one where she confessed to killing "her"—was about a dog, not Jodie. But Samantha admitted to the DCI that she and Talley broke into the home through her bedroom window. She told the DCI Talley started strangling Jodie without her knowledge but then admitted that she "put a pillow over [Jodie's] face to stop her from suffering." She claimed that she did not suffocate Jodie to death and that Jodie was still breathing when she left the bedroom. In this version of events, Samantha said Talley was in the bedroom about five minutes after Samantha left the room. And she admitted that they left the house with stolen cash. She also agreed with the DCI agent that she left the bedroom while she knew Jodie was being murdered.

When the agents explained that they had spoken with Talley and he was setting Samantha up for a premeditated-murder charge, Samantha's story shifted a bit. She then told agents that she went into Jodie's bedroom because she heard screaming, she put the pillow over Jodie's face, and she paced while Talley continued strangling Jodie. As she put it to the agents near the end of that conversation: "That doesn't look good on me."

Samantha testified at trial in a way that was broadly consistent with what she told the DCI during the second interview and the timeline laid out in this opinion. Samantha said she climbed through her window at the family home to let Talley in, and that she was eating string cheese and drinking Gatorade in the kitchen when she unscrewed the kitchen surveillance camera. She said she then heard Jodie "scream" and found Talley in Jodie's bedroom, strangling her. Samantha told the jury she "froze" and couldn't help Jodie; instead she put a pillow over Jodie's face and pushed down, then she left the room, came back, and stepped on the pillow on Jodie's head. After she was somewhat fuzzy in her description of these acts in her testimony, a DCI agent in rebuttal testified that Samantha had re-enacted the pillow incident during a proffer session by "grinding her foot into a pillow that was on top of Jodie Bevans'[s] face."

When repeatedly given the opportunity to explain the Snapchat video where she confessed, Samantha gave meandering and nonsensical answers in front of the jury. When asked about the "kill Jodie" note in her handwriting, Samantha admitted to writing it—but claimed she did so after the murder, not before.

The gist of Samantha's defense was that Talley was abusive, controlling, and manipulative, and he was the one she believed literally ended Jodie's life. A

psychologist testified in generalities about battered women and victims of domestic violence. But the psychologist said this history of trauma did not prevent someone from forming specific intent to harm, and she offered no opinion as to whether Samantha could form specific intent to kill. A different forensic psychologist testified in rebuttal that, based on an evaluation and interview, Samantha was able to premeditate, deliberate, and form specific intent to kill. The expert emphasized the Snapchat video and how Samantha was "basically bragging about killing her stepmother and giving the video the finger and things like that."

The jury found Samantha guilty as charged of murder in the first degree, a class "A" felony in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2022). She appeals.

## II. Discussion

Samantha challenges denial of her pretrial motion to change venue, denial of her motion for mistrial related to a recording, the sufficiency of the evidence, and the jury instructions. As these claims involve differing standards of review, we address each in turn.

## A. Change of Venue

Samantha first urges that her pretrial motion for change of venue should have been granted. We review the record de novo, but Samantha is only entitled to relief if the district court abused its discretion. *State v. Dorsey*, 16 N.W.3d 32, 41 (Iowa 2025). Our supreme court recently summarized the legal basis on which the district court may exercise that discretion:

> To show that a change of venue is warranted, the moving party must show (1) publicity attending the trial that is so *pervasive and inflammatory* that prejudice must be presumed, or (2) actual

prejudice on the part of the jury. Whether publicity rises to the level of being presumptively prejudicial depends on the following factors: the nature, tone, and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire.

Exposure to news accounts does not by itself create a substantial likelihood of prejudice in the minds of prospective jurors. The crucial determination is whether, as a result of pretrial publicity or for other reasons, a substantial number of prospective jurors hold such fixed opinions on the merits of the case that they cannot impartially judge the issues to be determined at trial.

Thus, the focus is on whether a substantial number of potential jurors from the county could not be impartial, a fact that cannot be presumed without assessing the actual impact on the potential jurors.

*Id.* at 42–43 (cleaned up).

It is an abuse of discretion for a district court to "rel[y] on its concern about the logistics of the trial to grant [a] motion for change of venue before even attempting to assemble a jury pool." *Id.* at 44. For this reason, "[v]oir dire is a critical part of determining whether an impartial jury can be selected in the county of the offense." *Id.*

In our de novo review, we discern no abuse of discretion in the district court's decision to deny Samantha's pretrial motion for change of venue without prejudice to her ability to renew her challenge after voir dire. As *Dorsey* now makes clear, this procedure is strongly preferred—and perhaps required—before granting change of venue based on pretrial publicity. *See id.* at 42–47. We have also reviewed the news articles presented by Samantha at the pretrial hearing, and we agree with the district court that the news coverage was neither pervasive nor inflammatory. To the contrary, the articles were largely factual. While Samantha decries that the news articles quoted her Snapchat confession, it was the evidence—not the news coverage—that painted a damning portrait. We also think

it proper that the court considered its experience in seating a fair and impartial jury during the Talley case in that same community, as it was a reasonable barometer for media saturation related to this trial.

Tellingly, Samantha did not renew her motion for change of venue after voir dire.[5] Our review confirms the vast majority of prospective jurors did not know any material information about the case. The record also reflects Samantha only challenged three prospective jurors for cause on this basis (in a venire panel of thirty-six), and all three of her challenges were granted.

We conclude the district court handled the venue-change motion consistent with *Dorsey* and other applicable law, we discern no abuse of discretion, and we affirm on this issue.

### B. Motion for Mistrial

Samantha's second contention is that the district court should have granted her motion for mistrial after a recording of a DCI interview with Samantha was admitted into evidence without objection but vaguely referred to statements Samantha made to her biological mother—a subject that was arguably limited by a pretrial motion in limine.[6] We review for an abuse of discretion, mindful that "[t]he court is found to have abused its discretion only when defendant shows prejudice

---

[5] There is perhaps a lurking error-preservation question of whether this issue is properly reviewable on appeal when the district court denies venue change without prejudice, suggests the defendant can renew the motion after voir dire, and the defendant fails to do so. We leave that question for another day.

[6] The district court didn't seem to think its pretrial ruling reached the evidence at issue, though it avoided declaring this directly. At minimum, our review of the transcripts and the pleadings convince us the motion in limine and resulting ruling were somewhat ambiguous or do not unequivocally apply to the evidence at issue.

which prevents him from having a fair trial." *State v. Callender*, 444 N.W.2d 768, 770 (Iowa Ct. App. 1989).

The district court below denied the mistrial for two reasons: first, because Samantha's attorney failed to object even though she had the opportunity to (and seemingly did) review the exhibit before trial; and second, because the information regarding Samantha's biological mother came through questions by the DCI agents, it was not offered for the truth of the matter asserted, and an objection would have been overruled. We agree with both of these bases, and neither reflects an abuse of discretion.

First, we agree with the district court that Samantha's failure to object to the exhibit waived any error and she cannot belatedly raise this objection. As the district court observed, defense counsel had a full opportunity to review the exhibit before trial, and either did not do so or reviewed the exhibit and did not notice the arguably offending statements. In her appellate brief, Samantha seems to argue that her motion in limine preserved error despite her failure to object at trial. Even if we assume the motion in limine arguably covered the statements at issue, it was still incumbent on Samantha to object to preserve error. *See State v. Delaney*, 526 N.W.2d 170, 177 (Iowa Ct. App. 1994); *State v. Totaye*, No. 22-1169, 2024 WL 3518074, at *7 (Iowa Ct. App. July 24, 2024) (holding defendant waived grounds for mistrial when objectionable information "was read to the jury without objection").

Second, to the extent we look past the waiver issue and evaluate prejudice, we agree with the district court that statements posed as questions by law enforcement generally are not offered for the truth of the matter asserted. *See,*

*e.g., State v. Esse*, No. 03-1739, 2005 WL 2367779, at *3 (Iowa Ct. App. Sept. 28, 2005). Again tellingly, when the district court offered a limiting instruction to ensure the jury knew the statements were not offered for the truth of the matter asserted, Samantha declined, with her counsel explaining: "We would like to leave well enough alone." And the court said on the record it would have denied the defense objection had it been timely made, which convinces us there was not even arguable prejudice to Samantha in denying the motion for mistrial.

We discern no abuse of discretion nor any proof denial of the mistrial rendered Samantha's trial unfair.

### C. Sufficiency of the Evidence

We are not entirely sure what to make of Samantha's third argument on appeal. The heading and conclusion of the third division of her brief reference sufficiency of the evidence. And there is a singular reference to "premeditation" near the end of that argument subsection. But most of the argument in this section summarizes her expert's testimony on what is commonly referred to as "battered women's syndrome." The problem for Samantha is that her own expert testified that a history of abuse and accompanying psychological distress would not prevent a person from forming intent to kill. And even without that evidence, we aren't sure how this would amount to a sufficiency challenge, as we are required to view the evidence in the light most favorable to the State—meaning we must assume the jury rejected Samantha's expert in favor of evidence that supported the guilty verdict. *See State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022).

At another point in the appellate briefing, Samantha urges it was "plausible" she had diminished capacity. Again, this argument has problems from the get-go.

First, the evidence presented on diminished capacity was limited at best, in part because Samantha failed to timely notice the defense. Second, we cannot grant relief on appeal merely because a defense theory of the case is a "plausible" alternative to the State's theory. *Cf. State v. Hernandez*, 20 N.W.3d 502, 507–08 (Iowa Ct. App. 2025) (en banc) ("A criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him instead of the victim."). We see no basis for relief related to diminished capacity.

To the extent there is an actual sufficiency-of-the-evidence challenge in Samantha's brief, we reject it based on our lengthy summary of the evidence against her earlier in this opinion. Samantha's Snapchat confession alone likely supplied the essential elements for conviction of first-degree murder, while Wells's statements, the digital forensics, and other evidence supplied ample corroboration. And Samantha's trial testimony—in which she again confessed to participating in Jodie's murder—was likely sufficient to convict her of first-degree murder as an aider and abettor, even absent corroboration. *See* Iowa R. Crim. P. 2.21(4) ("The confession of the defendant, *unless made in open court*, will not warrant a conviction unless accompanied with other proof that the defendant committed the offense." (emphasis added)). The jury was presented with overwhelming evidence of guilt, and we discern no basis to disturb the verdict.

### D. Jury Instructions

Last, Samantha complains that "the jury instructions here lacked a marshalling instruction indicating which type of intent belonged to which charge." But Samantha did not preserve this error below. She only argued against inclusion

of a general-intent instruction.[7]  And she cannot "amplify," "change," or expand it now on appeal.  *See State v. Hepperle*, 530 N.W.2d 735, 738 (Iowa 1995).

Even if we overlooked this fatal error-preservation problem, we would still have to summarily deny relief.  The jury convicted Samantha of first-degree murder—the top charge, and one that required proof Samantha "acted . . . with a specific intent" as marshaled.  Whether any error arose in the lesser-included offense related to general intent is necessarily harmless because the jury was not required to proceed to the lesser-included charges once they reached a unanimous verdict of first-degree murder.  *See State v. Negrete*, 486 N.W.2d 297, 299 (Iowa 1992); *State v. Nowlin*, 244 N.W.2d 591, 596 (Iowa 1976).

## III.  Disposition

Having considered all errors properly preserved and briefed on appeal, we affirm Samantha Bevans's conviction for first-degree murder.

**AFFIRMED.**

---

[7] Samantha seemingly abandons this complaint on appeal.  To the extent she reprises it, it is foreclosed by controlling supreme court precedent holding that the lesser-included offense of second-degree murder is a general-intent crime.  *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010).  And the jury here was instructed that second-degree murder did "not require a specific intent to kill another person," negating potential confusion.